Filed 4/13/21  P. v. Contreras CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D076180 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD236438) |
| LEONEL CONTRERAS et al., | ORDER MODIFYING OPINION |
| Defendants and Appellants. | NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on March 25, 2021, be modified as follows:

1. On page 2, the second and third sentences of the fourth paragraph shall be modified to read as follows:

In an argument Rodriguez joins in accordance with Rule of Court 8.200 (a)(5), Contreras asserts it was reversible error for the criminal division, and not the juvenile division, of the superior court to determine his fitness.  Contreras also contends the court prejudicially erred by failing to explain how it weighed the five criteria Proposition 57 required the court to consider in relation to one another.

2. The paragraph commencing at the bottom of page 16, directly under the heading "*Jurisdiction of the Criminal Court,*" with "Contreras asserts"

and ending at the top of page 17 with "was not prejudicial" is modified to read as follows:

Contreras and Rodriguez assert that the trial court lacked jurisdiction to determine whether they were unfit for juvenile treatment because Proposition 57 requires the prosecutor to commence proceedings against minors in *juvenile* court. The Attorney General responds that (1) the appellants forfeited this argument by failing to request a transfer after the case was remanded; (2) even if not forfeited, *Lara* did not mandate the transfer hearing be conducted by the juvenile court; (3) when the criminal court exercises jurisdiction conferred by juvenile law the superior court is designated as the juvenile court under Welfare and Institutions Code section 245; and (4) even if there was error, it was not prejudicial.

3. At the end of the last paragraph on page 18, the two sentences commencing with "It was" and ending with "on appeal" are modified to read as follows:

It was, therefore, the appellants' obligation to request the transfer determination be made by a juvenile department. Their failure to object waived the argument they now make on appeal.

4. On page 20, the last sentence of Section III of the opinion, that starts with "The trial court was" and ends with "on fitness," is modified to read as follows:

The trial court was provided with ample information about the resources and programs available to Contreras and Rodriguez to adequately inform its decision on fitness.

There is no change in the judgment.

McCONNELL, P. J.

Copies to: All parties

2

Filed 3/25/21  P. v. Contreras CA4/1 (unmodified opinion)

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>LEONEL CONTRERAS et al.,<br><br>     Defendants and Appellants. | D076180<br><br><br><br>(Super. Ct. No. SCD236438) |

APPEAL from orders of the Superior Court of San Diego County, Peter C. Deddeh, Judge.  Affirmed, remanded with directions.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant Leonel Contreras.

Daniel J. Kessler, under appointment by the Court of Appeal, for Defendant and Appellant William S. Rodriguez.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Respondent.

In 2011, Leonel Contreras and William S. Rodriguez, both 16 at the time, kidnapped a 15-year-old girl and a 16-year-old girl and dragged them into a secluded area where they took turns brutally raping and sodomizing the girls for over a half hour. The following year, separate juries convicted them of various crimes related to the incident. Thereafter, Contreras was sentenced to 50 years to life plus 8 years and Rodriguez to 50 years to life. The trial court also imposed restitution fines and various fees.

While their appeals of the convictions were pending, Proposition 57 was passed by the electorate. The new law significantly modified the procedure used to determine if juvenile defendants can be charged as adults. In *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299 (*Lara*), the California Supreme Court ruled the changes applied retroactively to all non-final cases. After this court and the Supreme Court affirmed Contreras's and Rodriguez's convictions and overturned their sentences as violative of the Eighth Amendment's prohibition on cruel and unusual punishment, the case was remanded.

Thereafter, the same trial court that presided over the criminal trial conducted an extensive fitness hearing in accordance with *Lara* to determine if Contreras or Rodriguez should be placed under the jurisdiction of the juvenile court or re-sentenced in criminal court. The court ruled that the prosecution had carried its burden to prove Contreras and Rodriguez were not suitable for juvenile treatment. The court resentenced Contreras to 25 years to life plus four years, and imposed the same fines and fees previously imposed. The court resentenced Rodriguez to 25 years to life, and stayed all fines and fees pending a hearing on Rodriguez's ability to pay.

Contreras and Rodriguez now challenge those orders. Contreras asserts it was reversible error for the criminal division, and not the juvenile

2

division, of the superior court to determine his fitness. He also contends the court prejudicially erred by failing to explain how it weighed the five criteria Proposition 57 required the court to consider in relation to one another. Contreras further argues the trial court erred by reimposing restitution fines and various fees without determining his ability to pay. Both Contreras and Rodriguez contend the court abused its discretion by finding them unfit for juvenile court because those decisions were not supported by the evidence. Finally, Rodriguez asserts, and the Attorney General concedes, his abstract of judgment must be amended to reflect the trial court's determination that the fines and fees imposed on him were stayed pending a hearing on his ability to pay. Additionally, the Attorney General argues the court's transfer decision is not appealable and should have been reviewed by way of writ petition.

For reasons we shall explain, we reject these arguments, with the exception of Rodriguez's contention that his abstract of judgment should be amended. Accordingly, the orders are affirmed, and in the event the ability to pay hearing for Rodriguez has not yet occurred, the trial court is directed to amend Rodriguez's abstract of judgment to reflect the stay of the imposition of fines and fees pending that hearing.

FACTUAL BACKGROUND

The heinous details of the crimes were set forth in this court's earlier unpublished opinion, *People v. Contreras et al.* (Jan. 14, 2015, D063428) [nonpub. opn.]. We reproduce the facts from that opinion here since they are critical to the trial court's fitness decision:

> *Prosecution Evidence Presented to Both Juries*
>      [Jane] Doe 2, then 15, accompanied [Jane] Doe 1, then 16, and Doe 1's parents to a party for one of Doe 1's relatives. The party was at the relative's house. At dusk, while the party was still going on, the girls went for a walk and sat down by a tree in an open space area. Contreras, then 16, and Rodriguez, then 16,

3

walked past them. Both boys wore dark clothing with hoods covering their heads. Rodriguez wore a red and black cap, a dark colored Padres T-shirt, and a long-sleeve, plaid or checkered jacket with a gray hood. Contreras wore a long-sleeve, dark-colored, hooded jacket.

A short time later, Contreras and Rodriguez tackled the girls from behind. Contreras tackled Doe 1 and Rodriguez tackled Doe 2. Both boys wore bandanas covering their noses and mouths. Contreras held a knife to Doe 1's throat. One of boys asked for the girls' cell phones.

The boys pulled the girls up and started taking them toward a street. Rodriguez covered Doe 2's mouth with his hand as she struggled to get away. Contreras repeatedly told Doe 1 to tell Doe 2 to "shut the f–k up." The boys forced the girls to walk across the street, up an embankment, and into a wooded area. As they started going up the embankment, Doe 2 continued to struggle and threw her weight backward, causing both her and Rodriguez to stumble. Doe 2 bit Rodriguez's hand and tried to get away. However, Doe 1, at Contreras's direction, told Doe 2 to be quiet and stop resisting.

When Doe 2 got up off the ground, Rodriguez tied his bandana around her mouth and told her he would hurt her if she screamed. He took her to a clearing. Contreras took Doe 1 to a different location nearby. The area was not lighted and was not visible from the street.

Rodriguez took off Doe 2's shorts and underwear. He told her to get down. As she lay on her back, he got on top of her, put his penis in her vagina, and started thrusting in and out. He pulled down the bandana and kissed her, putting his tongue in her mouth. He told her not to scream or he would hurt Doe 1. He asked her if she liked what he was doing. She was wearing a purity ring and had never had sexual intercourse before. His actions were painful and caused her to wince.

After what seemed like a long time to Doe 2, Rodriguez made her flip over. As she lay on her stomach, he put his penis in her anus and started thrusting in and out.

As Rodriguez was assaulting Doe 2, Contreras had Doe 1 lay down. He took off her shorts, underwear, and shoes, had her help him take off her dress, and had her take off her bra. He touched her breasts and tried to push his penis into her vagina, but his penis was soft. He asked her whether she was a virgin

4

and she told him she was.  He put his fingers in her vagina for a couple of seconds, which was painful for her.  He told her to keep her legs open and pushed his now erect penis into her, which was also painful for her.  He then started thrusting in and out.

After awhile, he took his penis out of her vagina, stood up, told her to suck it, and warned her he did not want to feel any teeth.  He put his penis in her mouth and pushed her head back and forth.  She gagged and threw up.  He then pushed his penis back into her vagina.  He told her to keep quiet and keep her legs open.  She tried to keep quiet, but made some noise because she was uncomfortable.  He told her to shut up.  He kept the knife in his pocket during the sex acts.

Around this time, Rodriguez called over to Contreras and the two boys switched places.  Rodriguez kissed Doe 1 and bit her cheek and neck.  He put his penis in her vagina and thrust in and out.  He then put his penis in her mouth and pushed her head back and forth.  She gagged and threw up again.  He lay down on the ground, had her get on top of him, pushed his penis into her anus, and had her "hump" him by moving up and down.  After a couple of minutes, he had her sit back down.  He put his penis in her mouth again and pushed her head back and forth.  She gagged and threw up again.

As Rodriguez was engaging in sex acts with Doe 1, Contreras took off Doe 2's dress and had her help him take off her bra.  Once all of her clothes were off, he had her lay on her back.  While holding the knife to her neck, he told her to open her legs "really wide."  He then put his penis into her vagina and started thrusting.  The action was painful to her.  He asked whether she was a virgin and she told him she was.  He also asked whether she had a boyfriend and where she went to school.  She told him she did not have a boyfriend and what school she attended.

After some period of time, Contreras moved further up on Doe 2.  While holding the knife in his hand, he put his penis in her mouth and told her to suck it.  She turned her head away and told him she could not breathe.  He put his penis back in her mouth and told her to try.  She turned her head away again.  He changed their positions so he lay on his back and she was on top of him.  He told her to put his penis in her vagina.  She told him she did not know how, so he put it in himself.  He told her to jump up and down, but she did not know what he meant.  He thrust up and down while fondling her breasts.  His knife was on

5

the ground nearby.  When they were in this position, Contreras's bandana slipped and Doe 2 got a good look at his face.

At some point, Contreras asked Doe 2, "Did [Rodriguez] f–k your mouth?"  She told him no.  Rodriguez then brought Doe 1 over to the same place as Doe 2.  Once more, Rodriguez put his penis in Doe 1's mouth and pushed her head back and forth.  Once more, she threw up.  Afterwards, the two boys switched again.

Rodriguez had Doe 2 get on her back and he put his penis in her mouth.  She turned her head away and told him she could not breathe, but he put his penis back in her mouth.  While this was occurring, Contreras put his penis in Doe 1's mouth.  He moved her head back and forth and warned her he did not want to feel any teeth. She gagged yet again.  Neither Contreras nor Rodriguez wore a condom during any of the sex acts.

When the boys decided to stop, they had the girls put their clothes back on.  As Doe 2 was getting dressed, Rodriguez kissed Doe 2, touched her legs, put his finger in her vagina, and told her she was beautiful.  Before Doe 1 got dressed, Rodriguez also kissed her and asked her if she liked what had happened.  He told her she was beautiful and that, if they had known each other before, she would have been his girlfriend.

Meanwhile, Contreras pulled a bicycle from the bushes.  The boys then directed the girls which way to go and told them not to say anything to anyone.  One of the boys said they would follow the girls home and come after the girls if they ever told anyone.  Contreras also threatened to find and hurt one of Doe 1's young relatives.

The girls walked down the slope and across the street, where they met up with Doe 1's parents, who had been looking for them.  They got in Doe 1's parents' car and left.  Doe 1's mother asked where they had been and what had happened to them.

At first, the girls did not say anything.  Doe 2 did not say anything because she thought the boys were still close by and she just wanted to get away.  However, Doe 1's mother asked them directly if they had been raped and they acknowledged they had been.  Doe 1's parents took them back to Doe 1's relative's home, where someone called the police.  Shortly after the police were notified of the crime, a helicopter flew over the area repeatedly

announcing the suspects' descriptions and that they were riding on the same bicycle.

On the night of the crimes, Rodriguez and Contreras were staying at Rodriguez's aunt's home, which was near the crime scene. [Footnote omitted.] Around the time the crimes were occurring, Rodriguez's aunt searched in and around the house for them, but could not find them. Sometime later, she heard a door slam. Five to seven minutes after that she heard the helicopter. When she learned what the helicopter was broadcasting, she hoped the suspects were not Rodriguez and Contreras.

She searched again for the two boys and found them in the garage. She was angry by the coincidence of their arrival and the helicopter's broadcasts. She told a police detective she initially thought the boys might be the suspects. However, she later concluded the boys could not have committed the crimes because they were too young and no one in the family owns anything with the "Padres" name on it.

When Rodriguez's cousin heard the helicopter's broadcasts, she went into the garage and confronted the boys. They were sweaty and looked nervous. Her mother, Rodriguez's aunt, told her Contreras admitted being one of the assailants, but he blamed Rodriguez for the crimes and said Rodriguez was the one with the knife.

A police detective found a bicycle matching the description of the one the assailants used along the side of Rodriguez's aunt's house. Detectives also found clothing in Rodriguez's aunt's garage and Rodriguez's father's home matching the girls' description of what the boys wore the night of the crimes. About six weeks after the crimes, a landscape worker found a knife while clearing brush near the crime scene.

After reporting the crimes, the girls submitted to sexual assault examinations. The girls' injuries and other physical findings were consistent with the girls' version of events.

DNA testing was conducted on swabs taken from the girls during their examinations. The tests showed Rodriguez was included as a possible minor contributor to a DNA mixture found on a swab taken from Doe 1's breast, Rodriguez was included as a possible major contributor and Doe 2 was included as a possible minor contributor to a DNA mixture found on a swab taken from Doe 1's neck, and Rodriguez was included as a possible

7

contributor to a DNA mixture found on a swab taken from Doe 1's vulva.

DNA testing was also conducted on several items of clothing found by detectives, including a black hooded sweatshirt, a Padres T-shirt, and a plaid jacket. Rodriguez, Doe 1, and Doe 2 were all included as possible major contributors to a DNA mixture found on swabs taken from the waistband and shoulder area of the sweatshirt. They were also all included as possible contributors to a DNA mixture found on a swab taken from the cuffs, and Rodriguez and Doe 1 were included as possible major contributors to a DNA mixture found on a swab taken from the inside neck.

Doe 1's DNA matched DNA found on a swab taken from the waistband area of the Padres T-shirt. Rodriguez and Doe 2 were included as major contributors and Contreras and Doe 1 were included minor contributors to a DNA mixture found on dark-stained cuttings from the front waistband area of the shirt.

Doe 2 was included as a possible major contributor to a DNA mixture found on a swab taken from the waistband of the plaid jacket, Doe 1 was included as a possible major contributor to a DNA mixture found on a swab taken from the shoulder area, and Doe 1 and 2 were both included as possible major contributors to DNA mixtures found on swabs taken from the inside cuffs and neck area. Doe 2 was included as a possible major contributor to DNA found on presumptively bloodstained cuttings from around the jacket's buttonholes.

Both Doe 1 and Doe 2 identified Rodriguez from a photographic lineup and at trial. Doe 2 also identified Contreras at trial.

*Additional Prosecution Evidence Presented to Rodriguez's Jury*

Rodriguez's jury heard a recording of Rodriguez's statement to police detectives. The statement largely corroborated the victims' accounts.

*Additional Prosecution Evidence Presented to Contreras's Jury*

Contreras's jury heard recordings of Contreras's statement to police detectives. Contreras told police detectives he went to his aunt's house the night of the crimes. He had a knife with him. He and Rodriguez discussed what they were going to do that night. Their first idea was to rob people. However, they

changed their mind after a lady passed by them. They stashed their bicycle and, as they were walking around, Contreras pointed out Doe 1 and Doe 2 and Rodriguez said, "Let's go."

Contreras said he asked for the girls' cell phone so they would not call anybody. He grabbed the taller girl and told her to stay still. Because he had a knife, he hoped the shorter girl would stay still as well. They took the girls across the street and up the embankment where they had stashed the bicycle. The taller girl tripped on the way up.

When they got to the area where he had stashed the bicycle, he told the taller girl to take off her clothes and bra. Then, he had her turn to face him and he "just put it in the front."

## PROCEDURAL BACKGROUND

After the conclusion of trial, Contreras's jury convicted him of one count of conspiracy to commit kidnapping and/or forcible rape (Pen. Code, § 182, subd. (a)(1); count 1), two counts of kidnapping (*id.*, § 207, subd. (a); counts 2 & 14), seven counts of forcible rape (*id.*, § 261, subd. (a)(2); counts 3, 5, 7–8, 15, 17 & 20), one count of rape by a foreign object with force (*id.*, § 289, subd. (a)(1)(A); count 4), eight counts of forced oral copulation (*id.*, former § 288a, subd. (c)(2)(A); counts 6, 9, 11–13, 18–19 & 21), and two counts of sodomy by use of force (*id.*, § 286, subd. (c)(2)(A); counts 10 & 16). Numerous enhancement allegations accompanied the sexual offense counts, including allegations that the crimes were committed during a kidnapping (*id.*, § 667.61, subds. (a), (c), & (d)(2) and (b), (c), & (e)), that they involved multiple victims (*id.*, § 667.61, subds. (b), (c), & (e)), that a deadly weapon was used (*id.*, § 12022.3, subd. (a)), and that a knife was personally used (*id.*, § 667.61 subds. (b), (c), & (e)). The jury found all of the accompanying enhancements applicable, except for the multiple victim enhancements for counts 4 and 5.

9

The prosecution charged Rodriguez with the same offenses and enhancement allegations, except for the weapon use enhancements. A separate jury convicted Rodriguez of counts 2, 8 through 12, 14 through 16, and 21, and found the accompanying enhancement allegations applicable. The jury found Rodriguez not guilty of count 4. The jury could not reach unanimous verdicts on counts 1, 3, 5 through 7, 13, and 17 through 20. The court declared a mistrial as to these counts and later dismissed them without prejudice.

The court sentenced Rodriguez to a prison term of 50 years to life and imposed various fines and fees. The court sentenced Contreras to 50 years to life for the attack and added an additional 8 years because of his knife use. The court imposed a $10,000 victim restitution fine (Pen. Code, § 1202.4, subd. (b)), a suspended parole revocation fine of the same amount (*id.*, § 1202.45), $2,292.51 in actual restitution (*id.*, § 1202.4 subd. (f)), a $840 court security fee (*id.*, § 1465.8), a $630 criminal conviction assessment fee (Gov. Code, § 70373), and a $154 criminal justice administration fee (*id.*, § 29550).

On appeal, this court affirmed the judgment but reversed the sentences, finding they constituted cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution. (*People v. Contreras et al.* (Jan. 14, 2015, D063428) [nonpub. opn.].) The People sought review of the decision, which the California Supreme Court granted. (*People v. Contreras* (Feb. 26, 2018) 4 Cal.5th 349 (*Contreras*).) While the case was pending consideration by the Supreme Court, voters passed Proposition 57, eliminating the prosecutor's ability to directly file juvenile cases in adult court and creating a new transfer hearing procedure. (*Lara, supra*, 4 Cal.5th at p. 303.) The same year the new law became effective, the Supreme Court

10

both affirmed this court's prior decision and, in *Lara*, held Proposition 57 applied retroactively to all cases not yet final on appeal. (*Id*. at p. 309.) Therefore, Contreras and Rodriguez, who were charged directly in criminal court, were entitled to transfer hearings under the new law.[1] (*Id*. at p. 313.)

Following remand, the trial court held a transfer hearing over several days. The parties presented numerous witnesses who opined on Contreras's and Rodriguez's fitness for juvenile court. At the conclusion of the hearings, the court determined that the People had carried their burden of proving that both men were not suitable for juvenile treatment. Thereafter, the court resentenced Contreras to 25 years to life plus 4 years and reimposed the same fines and fees. As to Rodriguez, the court resentenced him to 25 years to life and stayed all fines and fees pending an ability to pay hearing.

DISCUSSION

The Attorney General argues "the denial of a transfer motion is not an appealable order" and, accordingly, "this court should not address these claims on direct appeal." Contreras and Rodriguez respond that because of the unusual procedural posture arising from the change in the law after conviction, the orders are now properly before this court. As to the merits, Contreras argues the court's fitness decision is invalid because Proposition 57 directs that the transfer hearing be conducted by the juvenile court. Contreras also asserts the court abused its discretion by failing to explain how it weighed the factors it was required to consider under the newly

---

[1]    The Supreme Court's disposition affirmed this court's opinion, remanded for resentencing, and directed the sentencing court "to consider, in light of this opinion, any mitigating circumstances of defendants' crimes and lives, and the impact of any new legislation and regulations on appropriate sentencing. The sentencing court is further directed to impose a time by which defendants may seek parole, consistent with this opinion." (*Contreras, supra*, 4 Cal.5th at p. 383.)

11

amended Welfare and Institutions Code section 707.[2]  Both Contreras and Rodriguez assert the court abused its discretion by focusing solely on the seriousness of the offense, and that the evidence did not support the court's findings they were unfit for juvenile treatment.

With respect to the fines and fees imposed by the court, Contreras asserts they must be stayed pending a hearing on his ability to pay.  Finally, Rodriguez requests this court amend the abstract of judgment to reflect the trial court's decision to stay the fines and fees assessed pending a hearing. The Attorney General does not oppose the request.

I

*Background of Juvenile Jurisdiction*

*Lara* "summarized the procedures in the juvenile court system. 'Generally, any person under the age of 18 who is charged with violating a law is considered a "minor."  (See § 602.)  A "juvenile court" is a separate, civil division of the superior court.  (§ 246.)  A prosecutor charges a minor with an offense by filing a juvenile petition, rather than a criminal complaint. (See §§ 653.7, 655.)  Minors "admit" or "deny" an offense, rather than plead "guilty" or "not guilty."  (§ 702.3.)  There are no "trials," per se, in juvenile court, rather there is a "jurisdictional hearing" presided over by a juvenile court judge.  (§ 602.)  The jurisdictional hearing is equivalent to a "bench trial" in a criminal court.  (See Cal. Rules of Court, rule 5.780.)  Although a juvenile court judge adjudicates alleged law violations, there are no "conviction[s]" in juvenile court.  (§ 203.)  Rather, the juvenile court determines—under the familiar beyond the reasonable doubt standard and under the ordinary rules of evidence—whether the allegations are "true" and

---

[2]     Subsequent undesignated statutory references are to the Welfare and Institutions Code.

12

if the minor comes within its jurisdiction. (See § 602 et seq.)" (*Lara, supra*, 4 Cal.5th at p. 306.)

" 'There is no "sentence," per se, in juvenile court. Rather, a judge can impose a wide variety of rehabilitation alternatives after conducting a "dispositional hearing," which is equivalent to a sentencing hearing in a criminal court. (§ 725.5; *In re Devin J.* (1984) 155 Cal.App.3d 1096, 1100.) In the more serious cases, a juvenile court can "commit" a minor to juvenile hall or to the Division of Juvenile Justice (DJJ) …. In order to commit a minor to the DJJ, the record must show that less restrictive alternatives would be ineffective or inappropriate. [Citation.] The DJJ, rather than the court, sets a parole consideration date. DJJ commitments can range from one year or less for nonserious offenses, and up to seven years for the most serious offenses, including murder. (See Cal. Code Regs., tit. 15, §§ 4951–4957.) A minor committed to DJJ must generally be discharged no later than 23 years of age. (§ 607, subd. (f).)' " (*Lara, supra*, 4 Cal.5th at pp. 306–307.)

" 'Historically, a child could be tried in criminal court only after a judicial determination, before jeopardy attached, that he or she was unfit to be dealt with under juvenile court law. Since 1975 the procedural requirements for fitness hearings have been established by section 707.' [Citation.] The general rule used to be that 'any individual less than 18 years of age who violates the criminal law comes within the jurisdiction of the juvenile court, which may adjudge such an individual a ward of the court.' (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 548, fn. omitted.)" (*Lara, supra*, 4 Cal.5th at p. 305.) "Amendments to former sections 602 and 707 in 1999 and 2000, some by initiative, changed this historical rule. Under the changes, in specified circumstances, prosecutors were permitted, and sometimes required, to file charges against a juvenile directly in criminal

13

court, where the juvenile would be treated as an adult. [Citations.] These provisions were in effect when the prosecution filed the charges against defendant[s here] directly in criminal court." (*Lara,* at p. 305.)

"Proposition 57 changed the procedure again, and largely returned California to the historical rule. 'Among other provisions, Proposition 57 amended the Welfare and Institutions Code so as to eliminate direct filing by prosecutors. Certain categories of minors ... can still be tried in criminal court, but only after a juvenile court judge conducts a transfer hearing to consider various factors such as the minor's maturity, degree of criminal sophistication, prior delinquent history, and whether the minor can be rehabilitated. (Welf. & Inst. Code, § 707, subd. (a)(1).)" (*Lara, supra*, 4 Cal.5th at pp. 305–306.)

## II

### *Appealability*

As discussed, in *Lara*, the Supreme Court "held that Proposition 57 applies retroactively to all cases not yet final at the time it was enacted." (*People v. Ramirez* (2019) 35 Cal.App.5th 55, 59 (*Ramirez*).) *Lara* also approved a remedy for cases like this one, where as a result of the timing of the crimes and the changes to the law enacted by Proposition 57, the defendants were entitled to a transfer hearing after conviction. *Lara* stated that in such cases, "[t]he appellate court must conditionally reverse the judgment and remand the matter to the juvenile court to hold a transfer hearing. If the juvenile court determines it would have transferred the juvenile to adult court, the adult court must reinstate the convictions and sentence. If the juvenile court finds it would not have transferred the juvenile, the court will treat the convictions as juvenile adjudications and impose an appropriate disposition." (*Ramirez,* at p. 59.)

14

California Rules of Court, rule 5.770, subdivision (g) provides that "[a]n order granting or denying a motion to transfer jurisdiction of a child to the criminal court is not an appealable order" and that "[a]ppellate review of the order is by petition for extraordinary writ." The Attorney General asserts this rule required Contreras and Rodriguez to seek review of the court's decision by way of a writ petition. The orders at issue, however, were not orders denying "a motion to transfer jurisdiction" in the typical sense. (Rule 5.770, subd. (g).) In an ordinary case, the transfer hearing and the subsequent order, would occur prior to conviction. Here, however, the orders resulted from the California Supreme Court's opinion remanding the case to the trial court with directions "to consider ... any mitigating circumstances of defendants' crimes and lives, and the impact of any new legislation and regulations on appropriate sentencing." (*Contreras*, *supra*, 4 Cal.5th at p. 383.)

This distinction is important, and brings the orders within the purview of Penal Code section 1237, subdivision (b). Penal Code section 1237 provides the authority for the appeal of certain orders in criminal cases. Under subdivision (b) of the statute, an appeal may be taken "[f]rom any order made after judgment, affecting the substantial rights of the party." Here, unlike the typical transfer order, the orders were issued after judgment.

Our Supreme Court has stated that "when an appellate court determines that error has occurred below, Penal Code sections 1260 and 1262 grant the reviewing court the authority to select among several dispositions, including but *not limited* to reversal of the judgment and the granting of a new trial. A reviewing court's remand for resentencing pursuant to Penal Code section 1260 is but one of these available dispositions and does not necessarily involve (or itself constitute) a reversal of the judgment...."

15

(*Peracchi v. Superior Court* (2003) 30 Cal.4th 1245, 1254–1255.) "[W]hen a reviewing court identifies error relating solely to sentencing, it ordinarily does not reverse the judgment of conviction or remand for a new trial. Rather, typically, it simply remands for resentencing." (*Ramirez*, at p. 63; *Peracchi*, at p. 1255.)

As in *Ramirez*, neither this court nor the Supreme Court reversed the judgment of conviction. The remand orders did not vacate the original sentence, "therefore [the] operative judgment[s] remained." (*Ramirez, supra,* 35 Cal.App.5th at p. 63.) Accordingly, the trial court's transfer order is an appealable post-judgment order.[3] (*Ibid*.; see *People v. Superior Court (Kaulick)* (2013) 215 Cal.App.4th 1279 ["when the judgment is modified (even if modified nunc pro tunc), the order modifying the judgment is a postjudgment order, which may be appealable under Penal Code section 1238, subdivision (a)(5)"].) We thus reject the People's assertion the claims are improperly raised in this case by direct appeal.

### III

*Jurisdiction of the Criminal Court*

Contreras asserts that the trial court lacked jurisdiction to determine whether he and Rodriguez were unfit for juvenile treatment because Proposition 57 requires the prosecutor to commence proceedings against

---

[3]     The Attorney General argues that *Ramirez*, an appeal by the People of a transfer order in a similar procedural posture, is inapplicable because it discusses Penal Code section 1238, subdivision (a)(5), rather than Penal Code section 1237, subdivision (b). These statutes, however, are analogs. The right to appeal is a creation of the state constitution and statute. Penal Code section 1238 sets forth the orders appealable by the People in a criminal matter, including "[a]n order made after judgment, affecting the substantial rights of the people" under subdivision (a)(5), while section 1237 does the same for criminal defendants. This distinction in *Ramirez* is one without a difference in this context.

minors in *juvenile* court. The Attorney General responds that (1) Contreras forfeited this argument by failing to request a transfer after the case was remanded; (2) even if not forfeited, *Lara* did not mandate the transfer hearing be conducted by the juvenile court; (3) when the criminal court exercises jurisdiction conferred by juvenile law the superior court is designated as the juvenile court under Welfare and Institutions Code section 245; and (4) even if there was error, it was not prejudicial.

Had the modifications to section 707 made by Proposition 57 been in place before the charges were filed, the prosecution would have been required to bring the charges in the juvenile court division and then file a motion to transfer to criminal court. (§ 707, subd. (a)(1).) Section 707, subdivision (a)(1) states: "In any case in which a minor is alleged to be a person described in Section 602 by reason of the violation, when he or she was 16 years of age or older, of any offense listed in subdivision (b) or any other felony criminal statute, the district attorney or other appropriate prosecuting officer may make a motion to transfer the minor from juvenile court to a court of criminal jurisdiction. The motion shall be made prior to the attachment of jeopardy. Upon the motion, the juvenile court shall order the probation officer to submit a report on the behavioral patterns and social history of the minor. The report shall include any written or oral statement offered by the victim pursuant to Section 656.2." (§ 707, subd. (a)(1).)

As discussed, this case did not, and could not, follow the path set forth by the current version of the statute for determining a juvenile's fitness for criminal court. Instead, Contreras and Rodriguez were provided with the ameliorative benefits of the new law using a modified procedure based on the Supreme Court's opinion in *Lara*. Once the case was remanded from the Supreme Court, the parties appeared at a status conference before the trial

17

court.  At the conference, the court set the dates for the transfer hearing. Neither appellant objected to this procedure or requested the case be transferred to a juvenile department.

"Whether a case should proceed in juvenile or adult court 'does not involve an issue of subject matter jurisdiction.' " (*In re Harris* (1993) 5 Cal.4th 813, 837 (*Harris*).)  " 'There is but one superior court in a county, though it is divided into different departments.' " (*People v. Cardona* (2009) 177 Cal.App.4th 516, 527; see also *Manduley v. Superior Court* (2002) 27 Cal.4th 537, 548 ["The juvenile court and the criminal court are divisions of the superior court, which has subject matter jurisdiction over criminal matters and civil matters, including juvenile proceedings.  (See Cal. Const., art. VI, § 10.)"].)  Reference to the jurisdiction of the juvenile court or the jurisdiction of the criminal court, therefore, does not "refer to subject matter jurisdiction, but rather to the statutory authority of the particular division of the superior court, in a given case, to proceed under the juvenile court law or the law generally applicable in criminal actions." (*Manduley,* at p. 548, fn. 3.) Thus, "[w]hen exercising the jurisdiction conferred by the juvenile court law, the superior court is designated as the juvenile court.  (Welf. & Inst. Code, § 245.)" (*Ibid.*)

" '[T]he right to trial in the proper department of the superior court may be waived.  "[I]t is well settled that a person who is eligible to have his or her case proceed in juvenile court may waive this right either knowingly, or by failing to timely and properly raise the matter." [Citation.]' " (*Cardona, supra,* 177 Cal.App.4th at p. 527; see also *Harris, supra,* 5 Cal.4th 837–838.) It was, therefore, Contreras's obligation to request the transfer determination be made by a juvenile department.  His failure to object waived the argument he now makes on appeal.

Further, as the Attorney General points out, *Lara* did not mandate that the juvenile division of the superior court conduct the transfer hearing after remand, as Contreras contends. Rather, the decision noted approvingly the remedies crafted by the Courts of Appeal in two cases not before it, which also addressed post-conviction application of the new law, *People v. Vela* (2017) 11 Cal.App.5th 68 (*Vela*) and *People v. Cervantes* (2017) 9 Cal.App.5th 569 (*Cervantes*).[4] (*Lara, supra*, 4 Cal.5th at p. 313.) In rejecting the People's argument that retroactively applying Proposition 57 would be too difficult procedurally, *Lara* approved of "remedies *like those* provided in *Vela* and *Cervantes*" and explained that the dispositions in those cases "are readily understandable, and the courts involved can implement them without undue difficulty." (*Lara, supra*, 4 Cal.5th at p. 313, emphasis added.) *Lara* does not hold that a retroactive transfer hearing must be conducted in juvenile court. Rather, it held defendants in the position of Contreras and Rodriguez must receive a transfer hearing. Here, both did, satisfying the requirements of *Lara*.

Finally, Contreras has not provided this court with evidence of any prejudice that resulted from a criminal department determining his fitness for juvenile treatment, rather than a juvenile one. (See Cal. Const., art. VI, § 13 ["No judgment shall be set aside … for any error as to any matter of procedure, unless, after an examination of the entire cause, including the

---

4    In *Vela*, the court applied Proposition 57 retroactively and "conditionally reversed" the defendant's conviction. (*Vela, supra*, 11 Cal.App.5th at p. 82.) In resolving the matter, the court "order[ed] the juvenile court to conduct a juvenile transfer hearing." (*Ibid.*) In *Cervantes*, the court held that the defendant could "avail himself of a fitness hearing, and if he does so, the matter shall be transferred to the juvenile court for a transfer hearing under Welfare and Institutions Code section 707." (*Cervantes, supra*, 9 Cal.App.5th at p. 621.)

evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."]; Pen. Code, § 1258.) While a juvenile department may have special knowledge of the resources available for juvenile offenders that might bear on its determination, this case was atypical. Both men presented extensive expert testimony on their fitness for juvenile treatment and the benefits that would be afforded by such treatment, including the testimony of the senior supervising psychologist for the sexual behavior program at the DJJ where both men would be placed if determined fit. The trial court was provided with ample information about the resources and programs available to Contreras to adequately inform its decision on fitness.

IV

*The Court Did Not Abuse Its Discretion in the Application of Section 707*

Contreras and Rodriguez both contend the court abused its discretion by concluding they were not fit for treatment in juvenile court. Contreras also argues it was an abuse of the court's discretion to fail to explain how it weighed the five factors it was required to consider under section 707 in reaching its decision.

A

*Legal Standards*

Under the transfer procedure created by Proposition 57, the prosecution may petition the juvenile court to transfer a minor to adult court if the minor is charged with a specific offense like kidnapping and rape with bodily injury, and the crime is committed when the minor is 14 years or older.

20

(§ 707, subd. (a)(1).)[5]  Before the transfer hearing, and as occurred here, the court must order that the probation officer submit a suitability report, including a written or oral statement by the victim.  (*Ibid.*)

Following consideration of the suitability report and "any other relevant evidence that the petitioner or the minor may wish to submit, the juvenile court shall decide whether the minor should be transferred to a court of criminal jurisdiction."  (§ 707, subd. (a)(3).)  In determining whether the minor is suitable for juvenile adjudication, the court must evaluate five statutory criteria:

> (A)(i) The degree of criminal sophistication exhibited by the minor.  [¶]  (ii) When evaluating the criterion specified in clause (i), the juvenile court may give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense, the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior, the effect of familial, adult, or peer pressure on the minor's actions, and the effect of the minor's family and community environment and childhood trauma on the minor's criminal sophistication.

> (B)(i) Whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction.  [¶]  (ii) When evaluating the criterion specified in clause (i), the juvenile court may give weight to any relevant factor, including, but not limited to, the minor's potential to grow and mature.

> (C)(i) The minor's previous delinquent history.  [¶]  (ii) When evaluating the criterion specified in clause (i), the juvenile court may give weight to any relevant factor, including, but not limited to, the seriousness of the minor's previous delinquent history and the effect of the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior.

---

[5]  The law was subsequently amended by the legislature to state that in most cases a transfer hearing is available only if the minor is 16 years or older.  (Stats. 2018, ch. 1012, § 1.)

(D)(i) Success of previous attempts by the juvenile court to rehabilitate the minor. [¶] (ii) When evaluating the criterion specified in clause (i), the juvenile court may give weight to any relevant factor, including, but not limited to, the adequacy of the services previously provided to address the minor's needs.

(E)(i) The circumstances and gravity of the offense alleged in the petition to have been committed by the minor. [¶] (ii) When evaluating the criterion specified in clause (i), the juvenile court may give weight to any relevant factor, including but not limited to, the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development.

(§ 707, subd. (a)(3).)

"To justify the transfer of a minor from juvenile court to the criminal court system, the prosecution bears the burden of establishing by a preponderance of the evidence that the minor is not a suitable candidate for treatment under the juvenile court system. (Cal. Rules of Court, rule 5.770 (a).)" (*J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, 715 (*J.N.*).) The juvenile court's decision to transfer the minor to adult court is reviewed for an abuse of discretion. (*J.N.*, at p. 714 ["We review the juvenile court's finding the minor was unsuitable for treatment in the juvenile court for error under an abuse of discretion standard"]; *People v. Superior Court* (*Jones*) (1998) 18 Cal.4th 667, 680.) This is a deferential standard. (*Ibid.*) " 'When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination[.]' " (*Id.* at p. 681, italics omitted.)

22

## B

### *Contreras*

*1. Additional Background*

At the hearing, Contreras presented testimony from several witnesses; he did not testify on his own behalf. Krys Hunter, the senior supervising psychologist and program coordinator for sexual behavior treatment at DJJ, testified as a joint witness for both men. When asked by Contreras's attorney if "men like the two defendants in this case" would be contenders for successful DJJ treatment, she opined that "they would be very good candidates to do the program…." Hunter also admitted she could not predict whether any particular youth was going to be successful once that youth is released. She explained that DJJ does not "cure anybody" and that there was no magical formula for success.

Raymond Murphy, a psychologist, evaluated Contreras in 2012 and in 2018. He testified that Contreras would "absolutely" be successful in DJJ sex offender training. Murphy also diagnosed Contreras with posttraumatic stress disorder and "major depressive disorder recurrent with psychotic features." In 2012, another doctor diagnosed Contreras with "[a]dolescent antisocial behavior." Like Hunter, Murphy agreed there were "no guarantees" as to how Contreras would act once he was out of custody. Kristina Malek, a clinical and forensic psychologist familiar with research on juvenile sex offenders, met with Contreras three times. "After evaluating all of the criteria and taking into consideration all the discretionary factors," she "opined that he should remain in juvenile court."

Contreras presented testimony of two character witnesses. Viridian Word taught Contreras at an alternative high school for juvenile offenders. She testified that he had "a lot of great ideas" and was "somebody that was a

23

positive influence" on her class. Theresa Zatarain met Contreras when he was six years old and her children were in the same school as Contreras. She testified that "[h]e was always very respectful" when interacting with girls. Despite the evidence against him, and his confessions, Zatarain believed he was innocent of the crimes he committed.

The prosecution presented the testimony of two witnesses. Dr. Anthony Urquiza, a licensed psychologist, professor at UC Davis, and the director of the child abuse treatment program at UC Davis Medical Center, testified about both Contreras and Rodriguez. In preparation for the hearing, he reviewed probation reports, the attachments to those reports, and psychological evaluation reports. After reviewing these materials, Dr. Urquiza concluded, based on the criteria set forth in section 707, that Contreras was not fit for juvenile treatment.

Dr. Urquiza emphasized the sophistication of the crime, pointing to the facts that the appellants planned to commit a robbery; took steps to avoid detection, including repeated threats to the victims; and the long duration of the assault. Dr. Urquiza also opined that Contreras's use of a knife showed criminal sophistication. Dr. Urquiza concluded Contreras was not likely to be rehabilitated in the amount of time available in the juvenile system. He also testified that while many juveniles who are subject to difficult life circumstances commit crimes, like Rodriguez and Contreras, "they don't usually go to the level of severe de-humanizing behaviors" seen in this case.

Deputy Probation Office Jennifer Cook was assigned to evaluate Contreras's suitability for juvenile treatment. Cook had worked in juvenile hall for six years, then worked with adult offenders for nine years, and returned to juvenile hall for another six-years. Cook interviewed Contreras

before forming her opinion. Her ultimate recommendation was that Contreras should be treated as an adult and was "not fit for juvenile court."

*2. Analysis*

Citing *Kent v. United States* (1966) 383 U.S. 541 (*Kent*) and *C.S. v. Superior Court* (2018) 29 Cal.App.5th 1009 (*C.S.*), Contreras first asserts the trial court abused its discretion by not adequately explaining how it "weighed the various relevant factors against the required criteria," and how each factor impacted the court's decision. Specifically, Contreras argues "[t]he court said that it considered appellant's age, his socioeconomic status, biological factors like brain development, the impact of his father's death, and subsequent abuse in the household" but not "how each of those factors impacted the court's ultimate conclusion on each criterion."

"In *Kent*, the United States Supreme Court considered a juvenile court order from Washington D.C. that directed a minor be tried as an adult. (*Kent, supra*, 383 U.S. at p. 546.) The statute at issue provided the juvenile court with discretion as to the factors to consider and the weight to accord those factors, but nothing in the statute provided 'standards' for the juvenile court's decision. (*Id*. at p. 547.) Nevertheless, under principles of due process, [the court held] the minor was entitled to 'a statement of reasons.' (*Id*. at p. 557.) The statement did not need to be 'formal,' but it did need to demonstrate that the juvenile court had engaged in a 'careful consideration' of the issue. (*Id*. at p. 561.) Additionally, [the Supreme Court held] the juvenile court's order should 'set forth the basis for the order with sufficient specificity to permit meaningful review.' (*Ibid*.)" (*C.S., supra*, 29 Cal.App.5th at p. 1028.)

In *C.S.*, the Court of Appeal concluded remand was necessary because the trial court's transfer order failed to set forth sufficient findings to permit

effective appellate review. (*C.S.*, *supra*, 29 Cal.App.5th at p. 1035.) The juvenile court evaluated each of the five criteria, but for several failed to explain whether the criteria weighed in favor of or against transfer. (*Ibid*.) Further, the error was prejudicial because the record before the appellate court did not provide overwhelming evidence to support the court's decision to find the minor unfit and transfer to criminal court. (*C.S.,* at pp. 1036–1037.)

Neither *Kent* nor *C.S.* persuade us that the trial court abused its discretion by failing to adequately articulate the basis for its decision with respect to Contreras, or that it failed to adequately explain the weight it afforded each criterion. To the contrary, the court here specifically discussed its consideration of each factor and its weight. Indeed, at the conclusion of those comments the court stated explicitly that it was not basing its decision to find unfitness "solely on the gravity of the offense," even though it was "the most significant aspect" of the decision.

The court determined that based on the manner in which the crimes were committed, Contreras exhibited a high degree of criminal sophistication and the People had carried their burden on this first factor of section 707, subdivision (a)(3)(A). The court concluded the People had not met their burden on the second and third criteria, subdivisions (a)(3)(B) and (C), to show that Contreras could not be rehabilitated in the time remaining for juvenile jurisdiction and that his prior delinquency history favored criminal adjudication. The court indicated the fourth factor was a close decision, but that the People had shown that the previous attempt to rehabilitate Contreras was not successful because he reoffended less than a month after the juvenile court's jurisdiction ended for his prior juvenile offense of vandalism. Finally, after distinguishing this case from one relied on by the defense, *J.N., supra*, 23 Cal.App.5th 706, the court found the People had

26

shown the circumstances and gravity of the offense made Contreras unfit for juvenile treatment.

The court's lengthy explanation of its ruling satisfied the requirements of *Kent*—the explanation demonstrated the court engaged in "careful consideration" of the issues and "set forth the basis for the order with sufficient specificity to permit meaningful review." (*Kent, supra*, 383 U.S. at p. 561.) Far from the order in *C.S.*, which did not identify how the court viewed each criterion, the trial court here stated explicitly its ruling on each factor and how those factors impacted its final decision to find Contreras unfit for juvenile treatment. Contreras's assertion that the court's ruling precluded effective appellate review is unfounded.

Contreras also contends the court's decision was based solely on the seriousness of the offense and failed to take into consideration any of the other factors. He asserts "[t]he court here made it clear that nothing [but the gravity of the offense] mattered." This claim is contravened by the record. As discussed, the court set forth its ruling and rationale for each criterion it was required to consider and the basis for its conclusion that Contreras was unfit for juvenile treatment. In essence, Contreras asks this court to reweigh these factors and the court's determination and reach a different result. That is not our court's role. The trial court was presented with evidence concerning each factor for fitness as it related to Contreras, and the court appropriately identified the substantial evidence that supported its decision.

As the court in *C.S.* stated, "[i]t is settled law in other statutory schemes involving the consideration and weighing of numerous factors that the trier of fact may accord appropriate weight to each factor; the law generally does not require that the same weight be accorded to each factor. [Citation.] Nothing in section 707 indicates that the juvenile court was

27

required to give equal weight to each of the five criteria or that it would necessarily be an abuse of discretion to find that one criterion outweighed the other criteria." (*C.S., supra*, 29 Cal.App.5th at pp. 1034–1035.) The court's decision to place the greatest weight on the seriousness of the crimes committed by Contreras was not an abuse of its discretion.

## C

### *Rodriguez*

#### 1. *Additional Background*

Like Contreras, Rodriguez presented testimony of several expert witnesses and character witnesses. Unlike Contreras, he testified on his own behalf. Rodriguez called Doug Ugarkovich, a juvenile justice consultant, who had previously worked at the DJJ's sex offender program. He opined that Rodriguez would be a suitable candidate for treatment at DJJ. Rahn Minagawa, a clinical and forensic psychologist, testified that he personally interviewed Rodriguez in 2012 and 2018. He diagnosed Rodriguez with "stressor or trauma-related disorder, also known as complex trauma." He opined that Rodriguez "could be successfully rehabilitated if he were sent to DJJ." Hunter, the senior supervising psychologist and program coordinator for sexual behavior treatment at DJJ, also testified that an individual in Rodriguez's position would be able to successfully complete the sexual offender program at DJJ.

Rodriguez's older brother, Michael, testified on his behalf. Michael traveled to the U.S. two years before Rodriguez, who was brought to the border by a coyote and made the journey at age 14 with no other family members. Michael testified about the violence the family experienced in Guatemala that caused them to flee to the U.S. Michael said that when Rodriguez got to the U.S., he was different and distant. Rodriguez smoked

28

marijuana regularly and his aunt, with whom the brothers lived, eventually kicked him out of the house for his drug use and drinking. She let him return to the house, and just a week later Rodriguez was arrested for the crimes in this case. Michael testified that Rodriguez had turned his life around in prison. The brothers' relationship also improved, and Rodriguez helped Michael come to terms with his own trauma and find professional success as a chef.

Ruth Heid, another character witness, testified on Rodriguez's behalf and stated she had known Rodriguez for about 6 years. Rodriguez had attended a school where Heid worked as an instructional assistant. Even though he had committed a serious sex crime, she thought he was "an honorable young man [who] will do much good in society if he's given the chance."

During Rodriguez's testimony, he explained he immigrated to San Diego just after his 15th birthday. He admitted committing the offenses and explained how he had worked in custody to better his life. While incarcerated in juvenile hall, Rodriguez learned English on his own using a Spanish-English dictionary and worked on the requirements for his high school diploma. In prison, Rodriguez obtained his GED, became very religious, and participated in several self-improvement courses. He was chosen as the salutatorian speaker for his high score on the GED, and because of his dedication and success in his self-improvement courses, he was asked to facilitate anger management and alcoholics anonymous groups. He also obtained a job in prison as soon as possible. Despite the nature of his conviction disqualifying him from the position, he was also selected to work in the prison's educational department tutoring other students. Rodriguez

also began coursework to become a minister. Rodriguez expressed great remorse for his crimes and was dedicated to making the most of his life.

As with Contreras, the prosecution called two witnesses to testify, Dr. Urquiza and the Deputy Probation Officer assigned to prepare the transfer hearing report. Dr. Urquiza opined that like Contreras, Rodriguez was not suitable for juvenile treatment.

Deputy Probation Officer Casey Ryan evaluated Rodriguez's suitability for juvenile treatment. Ryan worked in the juvenile investigations unit and had assessed hundreds of juvenile offenders. Ryan's job was to "help the court understand the dynamics of the youth before them in going through their personal history, their school history, their family history, [and] substance abuse," among other factors. He was "well familiarized with the Welfare and Institution Code Section 707 factors." Of the 800 to 900 reports he had prepared, this crime was the worst he had seen. As part of his process, Ryan personally interviewed Rodriguez for about three hours. Ryan testified that his conclusion "did not come easily" or without a lot of thought by Ryan and his supervisors. His ultimate opinion was that Rodriguez should "remain in the jurisdiction of the adult court."

2. *Analysis*

Rodriguez asserts that the trial court's determination that he was unfit for juvenile treatment was not supported by the evidence. Specifically, he argues that the court's finding of criminal sophistication was error because the court's analysis focused only on the gravity of the offense, rather than on Rodriguez's sophistication. Rodriguez further asserts, like Contreras, that the court abused its discretion by basing its decision solely on the gravity and seriousness of the crimes.

30

In support of this argument, Rodriguez states that "Section 707 does not expressly permit the trial court to base its unsuitability finding on only one factor. Proposition 57 mandates that the trial court consider all of the factors set forth in subparagraphs (A) to (E) in rendering its transfer decision. The question is and should be whether the minor, as a person, is a fit subject for juvenile treatment. (§ 707.01.)" Rodriguez further contends that the trial court's decision requires reversal because he "demonstrated and expressed true remorse for his crimes and he took every step available to him to rehabilitate."

The record before this court undoubtedly demonstrates Rodriguez has made great strides over the course of his incarceration. His efforts are remarkable and deserving of praise. However, as discussed, it is not this court's role to reweigh the trial court's decision in the manner Rodriguez now requests. Contrary to his claims, the trial court thoughtfully evaluated each of the five criteria contained in section 707 and set forth the basis for its conclusion both as to each criteria and as to its ultimate decision that Rodriguez was not fit for juvenile treatment.

Specifically, the court found the People had proven by a preponderance of the evidence that the crime was executed with criminal sophistication, satisfying the first criteria of section 707. Contrary to Rodriguez's contention that this finding was based only on the gravity of the offenses, the court stated its decision was based on Rodriguez's active participation in the brutal crimes, including taking steps to avoid detection, secreting the victims to a private area, telling one of the victims to "shut up," and telling one of the victims her relative would be harmed if she came forward. These facts fall directly within the statute's directive for this factor to consider "the actual behavior of the person," "the person's degree of involvement in the crime,"

and "the level of harm actually caused by the person."  (§ 707, subd. (a)(3)(E).)
The court further stated it had, as also directed by the statute, taken into
consideration the trauma Rodriguez had suffered throughout his life.

The court sided with Rodriguez on the next three criteria, agreeing
with him that the prosecution had not shown by a preponderance of the
evidence that Rodriguez could not be rehabilitated within the time remaining
for juvenile court jurisdiction, that his previous delinquency favored adult
treatment, or that previous attempts at rehabilitation had failed.

On the final criteria, the circumstances and gravity of the offense, the
court found the People had met their burden.  As with its order for Contreras,
the court distinguished the case of *J.N.*, noting that the juvenile defendant in
that case, unlike Rodriguez, had not been an active participant in the crime
at issue.  Rather, the juvenile went to the area where the murder he was
charged with committing occurred to graffiti a home.  When rival gang
members arrived, a fight broke out between a rival and one of the juvenile's
fellow gang members, who shot and killed the rival.  The juvenile "was
shocked when the killing occurred and stood frozen." (*J.N., supra*, 23
Cal.App.5th at p. 724.)  The juvenile's only connection to the crime had been
his presence and membership in the gang.  (*Ibid.*)

The trial court reasonably found Rodriguez's active participation in the
brutal rape of the victims here was far different from the role of the
defendant in *J.N.*  The court recognized that Contreras was the initial
instigator of the crimes, but concluded that Rodriguez was "all in" once the
crimes began.  The court concluded the brutality of the offenses and
Rodriguez's primary role in them satisfied the prosecution's burden under the
statute's last criteria.  The court then found the final criteria "outweighs all
the other factors" and concluded Rodriguez was not fit for juvenile treatment.

These findings were supported by the evidence. Further, as discussed, the trial court was not precluded by the statute from giving the most weight in its analysis to the gravity of the heinous crimes. Contrary to Rodriguez's assertion, the law does not require the court give equal treatment to each of the five criteria set forth in section 707. Rather, "the court must consider all five factors, but has broad discretion in how to weigh them." (*People v. Garcia* (2018) 30 Cal.App.5th 316, 325.)

The trial court's decision in this case was made exceedingly difficult by its timing. Under the changed law, in a case filed after its enactment, the court is tasked with determining a defendant's fitness for juvenile treatment after the charges are filed and before any adjudication of the crime. Here of course, as a result of the reversal of his initial sentence under the Eighth Amendment and the intervening statutory amendments enacted by Proposition 57, the decision occurred *seven years after* Rodriguez's conviction.

In that lengthy intervening period, Rodriguez matured and turned his life around in admirable ways. In many respects Rodriguez exemplified the reasons for Proposition 57's enactment. Rodriguez's maturation, however, could not negate the monstrous crime he perpetrated and for which he was convicted. While we can envision the trial court reaching a different decision

in Rodriguez's case, the one it reached was not abuse of the discretion afforded by section 707.[6]

V

*Imposition of Restitution Fine & Fees on Contreras*

Contreras argues the fines and fees imposed by the trial court should be stayed pending a hearing on his ability to pay those fines. At Contreras's initial sentencing in 2013, the court imposed a $10,000 victim restitution fine (Pen. Code, § 1202.4, subd. (b)), a suspended parole revocation fine of the same amount (*id.*, § 1202.45), $2,292.51 in actual restitution (*id.*, § 1202.4 subd. (f)), an $840 court security fee (*id.*, § 1465.8), a $630 criminal conviction assessment fee (Gov. Code, § 70373), and a $154 criminal justice administration fee (*id.*, § 29550). At his resentencing in 2019, the court reimposed the previous fines and fees. Contreras raised no objection.

Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), Contreras contends the court's failure to conduct an ability-to-pay hearing

---

[6] We also note that it is impossible to say whether the metamorphosis that Rodriguez underwent in prison would have also occurred outside that highly structured environment. Additionally, whether Rodriguez could continue to thrive if released after the short period of additional confinement he would face if found fit for juvenile treatment is unknowable. (The record is imprecise on how much additional time in confinement Rodriguez and Contreras would face if adjudged fit for juvenile jurisdiction. As sex offenders, they would be placed in the DJJ's sex offender treatment program, which witnesses testified would allow the court's jurisdiction to be extended up to two years after they reached age 25, when jurisdiction would otherwise terminate. (See § 1769, subd. (b) ["A person who is committed to the [DJJ] by a juvenile court and who has been found to be a person described in Section 602 by reason of the commission of an offense listed in subdivision (b) of Section 707, shall be discharged upon the expiration of a two-year period of control or when he or she attains 25 years of age, whichever occurs later, unless an order for further detention has been made by the committing court pursuant to Article 6 (commencing with Section 1800).")]

34

before imposing the $10,000 restitution fine, and the court security, criminal conviction assessment, and criminal justice administration fees violated his federal due process rights. We reject Contreras's arguments concerning the fine and fees. Contreras had the statutory right, and thus was obligated, to object to the imposition of any restitution fine above the $300 statutory minimum. (Pen. Code, § 1202.4, subd. (c) [inability to pay may be considered when the restitution fine is increased above the minimum].) His failure to do so forfeits this claim of error on appeal. (*See, e.g., People v. Smith* (2020) 46 Cal.App.5th 375, 395–396; *People v. Keene* (2019) 43 Cal.App.5th 861, 863–864; and *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033.)

In addition, as Contreras points out in his briefing, this court has declined to adopt the *Dueñas* court's due process analysis. Instead, we have concluded that due process does not " 'bar[] the imposition of … assessments and [a] … restitution fine' even as to a defendant who is unable to pay." (*People v. Cota* (2020) 45 Cal.App.5th 786, 795; see *People v. Allen* (2019) 41 Cal.App.5th 312, 326 ["[W]e would adopt the reasoning of the numerous courts that have rejected *Dueñas*'s due process analysis."].)[7] For the reasons

---

[7] See also *People v. Petri* (2020) 45 Cal.App.5th 82, 92 [rejecting "defendant's reliance on *Dueñas* to support his contention that due process required an ability-to-pay finding"]; *People v. Adams* (2020) 44 Cal.App.5th 828, 832 ["Dueñas was wrongly decided"]; *People v. Hicks* (2019) 40 Cal.App.5th 320, 328, 329, review granted Nov. 26, 2019, S258946 [the issue of whether to require defendants, "many of whom are people of little or no means, to pay assessments that help defray the costs of operating the court system and restitution fines" is "a question to which, in our view, the federal and California Constitutions do not speak and thus have left to our Legislature"]; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1067, 1068–1069 (*Aviles*) ["We find that *Dueñas* was wrongly decided"].)

set forth in our prior decisions, we reject Contreras's due process argument on the merits.[8]

Finally, with respect to the three fees Contreras challenges, even if the trial court erred, any error was harmless. Contreras "will have the ability to earn prison wages over a sustained period." (*People v. Johnson* (2019) 35 Cal.App.5th 134, 139.) "Prison wages range from $12 to $56 per month, depending on the prisoner's skill level." (*Aviles, supra*, 39 Cal.App.5th at p. 1076, citing Cal. Code Regs., tit. 15, § 3041.2 and Cal. Dept. of Corrections & Rehabilitation, Adult Institutions Operations Manual (2019), art. 12 (Inmate Pay), §§ 51120.1, 51120.6, pp. 354–356.) "The state may garnish between 20 and 50 percent of those wages to pay the [Penal Code] section 1202.4, subdivision (b) restitution fine." (*Ibid*., citing Pen. Code, § 2085.5, subds. (a), (c).)

Given the length of his prison sentence, Contreras will have the ability to pay the $1,624 in fees (as well as the $10,000 restitution fine) based on the wages he may earn in prison. (See *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837 [ability to pay includes a defendant's ability to obtain prison wages]; Pen. Code, § 2085.5 [outlining how a restitution fine balance may be collected from prison wages]; *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1060–1061.) We thus reject Contreras's request for an ability-to-pay hearing.

VI

*Amendment of Rodriguez's Abstract of Judgment*

Lastly, Rodriguez makes an unopposed request for this court to amend the abstract of judgment to stay the fines and fees to accurately reflect the court's order providing him with an ability to pay hearing. At the conclusion

---

8    Contreras disavows any argument that the fees and fines should be analyzed under Eighth Amendment principals.

36

of appellant's sentencing hearing, his defense counsel stated: "Your, honor, I think I'm required to ask that any fines or fees be stayed pending the inability to pay." The trial court responded, "all right", and the minute order from the hearing states that "[a]ll fines are stayed pending an ability to pay hearing." The abstract of judgment, however, indicates the trial court imposed a $10,000 restitution fine, a suspended parole revocation fine of the same amount (Pen. Code, § 1202.45), a $400 court security fee (*id.*, § 1465.8), $2,292.51 in actual restitution (*id.*, § 1202.4, subd. (f)), and a $154 criminal justice administration fee (Gov. Code, § 29550). The record does not indicate whether the trial court held an ability to pay hearing. In the event that hearing has not yet occurred, the trial court is directed to amend Rodriguez's abstract of judgment to reflect the stay of the imposition of fines and fees pending that hearing.

## DISPOSITION

The orders are affirmed. In the event the ability to pay hearing for Rodriguez has not yet been held, the trial court is directed to amend Rodriguez's abstract of judgment to reflect the stay of the imposition of fines and fees pending that hearing.


McCONNELL, P. J.

WE CONCUR:


BENKE, J.


IRION, J.

37